# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| S.I.SV.EL. SOCIETA ITALIANA PER LO SVILUPPO DELL' ELETTRONICA S.P.A, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) | Civil Action No. 18-69-MN-CJB |
| RHAPSODY INTERNATIONAL INC., | ) ) ) | |
| Defendant. | ) ) ) ) | |
| | ) | |
| S.I.SV.EL. SOCIETA ITALIANA PER LO SVILUPPO DELL' ELETTRONICA S.P.A, | ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 18-70-MN-CJB |
| SPOTIFY USA INC., | ) ) | |
| Defendant. | ) | |

Timothy Devlin, DEVLIN LAW FIRM LLC, Wilmington, DE, Attorney for Plaintiff.

David E. Moore, Bindu A. Palapura and Stephanie E. O'Byrne, POTTER ANDERSON & CORROON LLP, Wilmington, DE; Patrick Bageant, HOLLYSTONE LAW, Boise, ID, Attorneys for Defendant Rhapsody International Inc.

David E. Moore, Bindu A. Palapura and Stephanie E. O'Byrne, POTTER ANDERSON & CORROON LLP, Wilmington, DE; Stefani E. Shanberg, MORRISON & FOERSTER LLP, San Francisco, CA, Attorneys for Defendant Spotify USA Inc.

## **MEMORANDUM OPINION**

March 12, 2019
Wilmington, Delaware

*signature: Christopher J. Burke*

**BURKE, United States Magistrate Judge**

Presently before the Court in this patent infringement case is Defendant Rhapsody International Inc. ("Rhapsody") and Defendant Spotify USA Inc.'s ("Spotify" and collectively, "Defendants") "Early Motion for Summary Judgment of Invalidity Pursuant to 35 U.S.C. § 101 ["Section 101"]" (the "Motion"), filed pursuant to Federal Rule of Civil Procedure 56. (D.I. 9)[1] Defendants argue that Plaintiff S.I.SV.EL. Societa Italiana per lo Sviluppo Dell'Elettronica S.p.A's ("Plaintiff") asserted United States Patent Nos. 7,412,202 (the "'202 patent"), 8,490,123 (the "'123 patent"), 7,035,863 (the "'863 patent"), 8,321,456 (the "'456 patent"), and 7,734,680 (the "'680 patent") (collectively, the "asserted patents" or the "patents-in-suit") are directed to non-patent-eligible subject matter pursuant to Section 101. (D.I. 11) This Memorandum Opinion will address the Motion as it relates to the '123 patent only.[2] For the reasons set out below, the Court DENIES Defendants' Motion as it relates to that patent.

**I.     BACKGROUND**

   **A.     Factual Background**

The '123 patent is entitled "Method and Device for Generating a User Profile on the Basis of Playlists." (D.I. 1, ex. 2 (the "'123 patent")) The '123 patent has 19 claims, of which two (claim 1 and claim 11) are independent claims. (*Id.*, cols. 8:31-10:44)

---

[1]     The Motion was originally brought jointly by three Defendants (in three separate cases): Civil Action No. 18-68-MN-CJB (in which the Defendant was Rakuten Kobo Inc.), Civil Action No. 18-69-MN-CJB (in which the Defendant is Rhapsody) and Civil Action No. 18-70-MN-CJB (in which the Defendant is Spotify). (D.I. 9) Subsequent to oral argument on the instant Motion, Plaintiff and Defendant Rakuten Kobo Inc. settled their case, (Civil Action No. 18-68-MN-CJB, D.I. 26; D.I. 27); the other two cases remain pending. Unless otherwise noted, citations to the record herein will refer to the record in Civil Action No. 18-70-MN-CJB.

[2]     The Court will address the remaining patents in subsequent Memorandum Opinions.

The technology described in the '123 patent relates to methods for "generating a user profile on a media device which has obtained a set of playlists." (*Id.*, col. 1:5-7) In general, the asserted patent claims "a method and device" where "the user profile is generated on the basis of the user's own playlists and properties derived from them." (*Id.*, Abstract) A "playlist," according to the patent, "is an ordered list of e.g. musical pieces (songs)[]" or other content, such as "pictorial pieces (video)." (*Id.*, col. 3:4-6)

The '123 patent explains that, at the time of the invention, it was "known in the art to use user preferences, e.g. in the form of a corresponding user profile, to recommend content [i.e., a song or a movie] to users." (*Id*, col. 1:20-23) The use of user preferences and a user profile in this way helped "users [of, for example, a CD player, a radio or a personal computer] to select or recommend content of preferred taste to them[]" while "reliev[ing] the user of the time-consuming task . . . of selecting appropriate media content among a huge amount of available content [of, for example, MP3 files.]" (*Id.*, col. 1:23-30) The patent explains that the previously known art obtained user preferences in one of two ways—either it: (1) required the users to assign a rating to the content at issue; or (2) observed how the user used the content (e.g., when the content was played back). (*Id.*, col. 1:35-38)

One problem with the prior art was that a single playlist could only be used to express "partial interests" (e.g., one playlist might "represent[] interest(s) in rock content, another . . . in movie content . . . whereas still another . . . in soap opera TV broadcasts"). (*Id.*, col. 1:39-44) In that way, the patent explains, a single playlist "can be an incomplete and . . . only partial expression for a partial user interest in a dedicated content area[.]" (*Id.*, col. 1:44-48) A need therefore arose, according to the patent, for a single playlist that represents "broad user interests

3

in several and various content areas (actually preferred by its owner and user)." (*Id.*, col. 1:49-52)

The patent lists additional problems with prior art methods/devices in this area. For example, "the task of observing usage of content [was] rather unreliable because a device that plays back content does not typically register who actually listens to and/or watches the content." (*Id.*, col. 1:53-56) Moreover, asking a user to provide explicit ratings on the content that they play back "places an additional time-consuming burden . . . on the user." (*Id.*, col. 1:56-58) And "current recommenders (that learn from examples)" in the market did not "efficiently analyze playlists composed by a user" in that they did "not analyze how the playlists are made" and provided recommendations for playlists in "a too simple manner, e.g. take best 10 items." (*Id.*, col. 1:59-65)

In light of all of this, the '123 patent explains that it was "an object of the present invention" to: (1) "provide an automated generation of a reliable user profile, which contains information about the user's preferences with respect to different playlist aspects[;]" (2) "solve the [other] above-[referenced] problems of the prior art[;]" and (3) "determine user preferences on the basis of the user playlist(s)." (*Id.*, cols. 1:66-2:5)

B. **Procedural Background**

The Court hereby incorporates by reference the summary of the procedural background of this matter, which was set out in its March 8, 2019 Memorandum Opinion ("March 8, 2019 MO"). (D.I. 25 at 4)

II. **STANDARD OF REVIEW**

The Court also incorporates by reference the standard of review applicable to summary judgment motions and the legal standards relating to Section 101, which were also set out in the March 8, 2019 MO. (*Id.* at 4-11)

### III. DISCUSSION

In addressing Defendants' Motion, the Court will first discuss which claims will be addressed herein. Thereafter, it will analyze these claims under both steps of the test for patent eligibility set out in *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S.Ct. 2347 (2014).

#### A. Claims at Issue

In its Complaint, Plaintiff alleged infringement of "at least claims 1, 2, 3, 5, 9, 10, 13, and 18 of the '123 patent." (D.I. 1 at ¶ 38) In their opening brief, Defendants made reference to each of the patent's 19 claims and moved that all of these claims be found ineligible. (*See* D.I. 11 at 18, 21; D.I. 16 at 2) Plaintiff, in its answering brief, then made specific reference to the content of independent claim 1 and dependent claims 2, 4, 5, 6, 8, 9, 12 and 17 (together, the "key claims") in explaining why all of the patent's claims were patent eligible. (D.I. 14 at 18-22) In light of this, the Court will address claims 1, 2, 4, 5, 6, 8, 9, 12 and 17 herein, understanding that Plaintiff's arguments for eligibility as to all of the patent's claims rise and fall on the arguments it made with regard to these particular key claims. *See Berkheimer v. HP Inc.*, 881 F.3d 1360, 1365-66 (Fed. Cir. 2018); *TMI Sols. LLC v. Bath & Body Works Direct, Inc.*, C.A. No. 17-965-LPS-CJB, 2018 WL 4660370, at *6 (D. Del. Sept. 28, 2018). But in doing so, the Court will primarily focus on independent claim 1 (the claim that also received the most attention in the parties' briefing).

Claim 1 recites:

> **1.** A method of generating a user profile for a given user

from at least one first playlist including a first sequence of content and being associated with the given user and stored on a media device, said method comprising:

automatically searching for the at least one first playlist among a plurality of playlists, wherein the plurality of playlists includes at least one of a second playlist and a third playlist, wherein the second playlist has a second sequence of content and is associated with a different user and the third playlist has a third sequence of content and is associated with the given user, and each playlist of the plurality of playlists including at least one identifying characteristic of content stored on the media device;

analyzing the at least one first playlist and automatically deriving from the at least one analyzed first playlist at least one playlist feature expressing at least one property of the at least one first playlist, the at least one playlist feature comprising an occurrence frequency or at least a content relationship of the plurality of playlists; and

automatically generating a user profile for the given user based on the analyzed at least one first playlist and the derived at least one playlist feature;

wherein at least one of the said searching, analyzing, and generating comprises use of computerized hardware including a processing element.

('123 patent, col. 8:31-55) With the exception of claim 17, each of the key claims depend on claim 1.[3] Claim 2 provides that the playlist feature should be at least one of a list of features,

---

[3] Claim 17 is dependent on claim 11, which is the other independent claim in the '123 patent. Claim 11 is an apparatus claim for a media device and is very similar in content to claim 1 (it has a "searching element," an "analyzing element" and a "generating element," the content of which essentially mirrors the "searching," "analyzing" and "generating" limitations in claim 1); perhaps for that reason, it is not discussed in depth in the parties' briefing. ('123 patent, cols. 9:39-10:17; *see also* Tr. at 76-77; '123 patent, col. 2:54-57 ("Said computer system and media device, respectively, provide the same advantages and solve the same problem(s) for the same reasons as described previously in relation to the method.")) For purposes of the Section 101 analysis, then, the Court will treat claim 11 as essentially the same as claim 1. As for claim 17, it adds the limitation to said media device "wherein the searching element, the analyzing

which includes tempo variance. (*Id.*, col. 8:56-67) Claim 4 is dependent not only on claim 1 but also on claim 3 (which requires that the method generate "at least one recommended playlist on the basis of said user profile"); claim 4 adds that the generating step in claim 3 comprises the use of a "Bayesian analysis and recommendation method[.]" (*Id.*, col. 9:1-6) Claim 5 adds that the "first playlist comprises an ordered list of content items, including songs or video, and the content items include metadata." (*Id.*, col. 9:7-10) Claim 6, which is dependent on not only claim 1 but also claim 5, builds on claim 5 by stating that the "metadata comprises title, artist, genre, tempo, and release year." (*Id.*, col. 9:11-12) Claim 8 provides that the user profile comprises at least one of "counts and/or percentages of categorical content-metadata in playlists" or "variances of numerical content-metadata in playlists." (*Id.*, col. 9:19-22) The remaining two claims specify: (1) potential types of media devices (claim 9), (*id.*, col. 9:23-25), and (2) "[a] non-transitory computer readable medium" for when the method is "run on a computer[]" (claim 12), (*id.*, col. 10:18-22).

## B. *Alice*'s Step One

Defendants assert that "[t]he claims of the '123 patent are directed to the abstract idea of creating a user profile based upon lists of what a user likes." (D.I. 11 at 18 (emphasis omitted); *see also* Tr. at 76) Plaintiff does not contest that "creating a user profile based upon lists of what a user likes" is an abstract idea; instead, it argues that the claims are not actually "directed to" such an idea. In that regard, Plaintiff asserts that Defendants have "flatly ignored the actual claim language and numerous detailed elements." (D.I. 14 at 18)

---

element, and the generating element are embodied in computerized hardware including a processing element." ('123 patent, col. 10:35-38)

7

There is surely some support in the patent specification for Defendants' view. For example, the title of the '123 patent ("Method and Device for Generating a User Profile on the Basis of Playlists") sounds a lot like a re-wording of the abstract idea (with the exception that the abstract idea does not fully encompass the concept of "[p]laylists[,]" an issue further discussed below). ('123 patent, col. 3:4-6) The patent's Abstract reads similarly when it states:

> In a method and device for generating a user profile on the basis of playlists, the user profile is generated on the basis of the user's own playlists and properties derived from them. In this way, more playlists are considered in the generation of a user profile, thereby generating a more reliable user profile. Aspects taken into account includes frequency of occurrence, creation date of the playlist, and relation between content items (songs, video, etc.) in one or more playlists.

(*Id.*, Abstract) One could read that summary and conclude that it describes the invention in a high-level, largely non-technological way, similar to the (admittedly high-level) way in which Defendants have articulated the abstract idea. (*See also id.*, cols. 1:6-2:5 (stating that a goal of the invention is "to provide an automated generation of a reliable user profile, which contains information about the user's preferences with respect to different playlist aspects"))

Another factor that tends to support Defendants' step one position is that, as Defendants suggest, "[h]umans can take into consideration lists of user preferences and create profiles, too." (D.I. 11 at 19) Defendants describe what seems like a human analogue to claim 1's method, noting how (as to the "searching" step) "[y]ou [can] observe your friend's existing playlists" and, in doing so (as to the "analyzing" step), "[y]ou realize your friend likes country music with an upbeat tempo[;]" therefore (as to the "generating" step) "[y]ou create a profile for your friend listing country songs with an upbeat tempo[.]" (Defendants' Oral Argument Presentation, Slide 28; *see also* Tr. at 78-79; D.I. 16 at 21; D.I. 17 at ¶ 54) Even though the claims here clearly

8

implicate the use of a computer processor and a media device (as is discussed further below), the fact that one can see how the claims might be performed by humans is another reason suggesting the claims are directed to the aforementioned abstract idea (and not to the more particularized subject matter suggested by Plaintiff). *Cf. D&M Holdings Inc. v. Sonos, Inc.*, 309 F. Supp. 3d 207, 213-15 & n.4 (D. Del. 2018) (concluding that the claim at issue was directed to the abstract idea of "playing a recording according to one's tastes[,]" where, *inter alia*, portions of the specification characterized the invention as "the mere automation of a well-known manual process") (internal quotation marks and citation omitted).

On the other hand, it does seem strange to conclude—in a patent that is all about *playlists*—that the claims are directed to an idea that does not explicitly encompass that subject matter. After all, the patent: (1) has the word "Playlists" in its title; (2) references "playlist(s)" in every claim; (3) is entirely drawn to discussing how musical or video or other similar playlists operate and are generated; and (4) is focused on the downsides to prior art playlist-based recommendation systems. The proffered abstract idea does include the phraseology "lists of what a user likes," but that concept sounds like it is broader than what a *playlist* actually is (i.e., a list that typically, if not exclusively, amounts to a collection of electronic content, like songs and videos that can be *played*). Thinking about it this way, it seems wrong to say that the basic thrust of the claims is about creating a user profile "based upon *lists of what a user likes*."

With the above in mind, the Court will assume *arguendo* that the claims are directed to the abstract idea put forward by Defendants, and will address concerns about what else is in the claim (including the playlist elements) at step two. *Cf. Enfish, LLC v. Microsoft Corp.*, 822 F.3d. 1327, 1339 (Fed. Cir. 2016) (noting that there may sometimes be "close calls" about how to characterize what a claim is directed to at *Alice* step one, and in such scenarios, an analysis of

9

whether the claims amount to an improvement to computer technology could take place at step two).

### C. *Alice*'s Step Two

At step two, the Court notes that there is surely more in the claims beyond "creating a user profile based upon lists of what a user likes." For one thing, that formulation of the abstract idea does not capture that, in claim 1, the user profile at issue is being created after the searching for and analyzing of a *first playlist* that is among a *plurality of playlists* (including at least one playlist associated with a different user). (Tr. at 90-91) And it does not explicitly capture that the analyzing and generating process is focused on identifying a *playlist feature* (either an *occurrence frequency* or *a content relationship of the plurality of playlists*) that expresses a property of the first playlist (and is later used to generate the user profile). (*Id.*)[4] The question is

---

[4] The abstract idea at issue also does not capture that the method is done *automatically*, via a *computer* that has a *processing element*. (Tr. at 87 (Defendants' counsel not contesting that the claims require that "a computer has to be involved")) But Plaintiff is not asserting here that any of the hardware mentioned in the patent claims is itself unconventional, nor is it arguing that the fact that the claims invoke a computer alone leads to patent eligibility. (Tr. at 93) This makes sense, as there is no evidence that the computer hardware utilized in the claims amounts to anything other than generic computer technology. The patent suggests that the "media device" referenced in the claims could be just about any form of electronic device that can generate and make use of the claimed user profile. To that end, the patent explains that the media device "may be a jukebox, a set-top box, a TV, a PC, a DVD player, a radio, a VCR and/or the like on which content from a playlist and/or recommended content from the user profile can be played back." ('123 patent, cols. 2:65-3:3; *see id.*, col. 7:12-17 ("The media device . . . may e.g. be a jukebox, a set-top box, a TV, a PC, a (e.g. portable) hard disk recorder, a solid-state device, a DVD player, a radio, a VCR or the like, where the media device . . . can take advantage of the generated user profile and the generated new playlists according to the present invention."); *id.*, col. 7:44-45 (making reference to "one or more CPUs or the processing power of the media device"); *id.*, col. 8:22-24 ("The invention can be implemented by means of hardware comprising several distinct elements, and by means of a suitably programmed computer.")) Claim 9 incorporates this concept into the claim's requirements, stating that the "media device" must be one of this series of specified well-known electronic devices. (*See id.*, col. 9:23-25) Dependent claim 12, a computer readable medium claim, adds only that it embodies a "computer program product" that includes "program code" for performing the

whether, at *Alice*'s step two, these additions, individually or viewed as an ordered combination with the rest of the claim elements, amount to the "something more" that defines an inventive concept.

Defendants contend that they do not, and that the claim elements are "non-inventive, whether taken alone or in combination." (D.I. 11 at 21-22 (explaining how many of the dependent claims are "a generic recitation of a conventional and well-known concept; none is unique, novel, or inventive[]")) In response, Plaintiff's main argument is that the claims "recite[] an unconventional ordered combination of elements, and thus recite patentable subject matter." (D.I. 14 at 20; *see also* Tr. at 93)

In assessing this "ordered combination of elements" issue, it should be noted that the patentee did not suggest that the use of a "playlist" was a new or unconventional thing. ('123 patent, col. 3:4-6) Nor are the "content items" found in the playlists said to be new or inventive. (*Id.*, col. 1:14-22 (noting that a content item can be "items of any media type (e.g. MP3)")) But do the ordered combination of claim elements nevertheless amount to hardware and software "perform[ing] [more than] well-understood, routine, and conventional activities commonly used in industry[,]" *Content Extraction and Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1348 (Fed. Cir. 2014), or amounting to a "non-conventional and non-generic arrangement of known, conventional pieces[,]" *BASCOM Global Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016), or providing a solution "rooted in computer

---

method of claim 1 on a computer. (*Id.*, col. 10:18-21) And claim 17, a media device claim, also recites generic hardware, stating no more than that the elements of claim 11 are "embodied in computerized hardware including a processing element." (*Id.*, col. 10:35-38)

technology in order to overcome a problem specifically arising in the realm of computer networks[,]" *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257 (Fed. Cir. 2014)?[5]

Defendants say no. Their expert, Dr. Kevin Jeffay, states in one paragraph of his declaration that "[a]s an ordered combination, the claimed limitations were still well-known and conventional to a [person of skill in the art]." (D.I. 17 at ¶ 58) He goes on to conclude that "[s]earching for a user's playlist(s), analyzing identified features of content from the user's playlist(s), and generating a user profile based upon analysis of those features was a well-known and conventional methodology far before the relevant date for the '123 patent." (*Id.*) Other than that, Dr. Jeffay says little more about this "ordered combination of elements" issue.

In rebuttal, Plaintiff primarily points to the declaration of its expert, Dr. Michael J. Pazzani. Dr. Pazzani's declaration on this point, while not lengthy, included more than just conclusory statements about "unconventionality." To that end, Dr. Pazzani explained that:

> Recommender systems often suffer from a cold start problem: recommendations to new users are not useful until the user has used the system for a meaningful period [of] time, allowing the system to infer their interests from their ratings or behavior. The methods of the '123 patent address this problem in a novel manner.

(D.I. 15 at ¶ 22)[6] The patent specification also seems to speak to what Dr. Pazzani is getting at here. As was previously noted above, it explains that the prior art typically sought insight on

---

[5] Defendants argue, and Plaintiff does not really contest, that the *particular* order in which the steps of the method claims are performed is not itself the inventive concept. (Tr. at 85-86, 96; D.I. 16 at 22; D.I. 17 at ¶ 58) The question instead is whether the combination of the elements together is enough to amount to an inventive concept. (Tr. at 85-86, 96)

[6] During oral argument, Defendants' counsel suggested that there was something improper about Dr. Pazzani providing an explanation about what this "cold start problem" is (and how it applies to the technology described in the patent) by way of his declaration—since the problem is not itself mentioned by name in the patent. (Tr. at 78-79; *see also* D.I. 16 at 23) The Court does not understand that line of argument; experts regularly provide additional context

12

user preferences by either: (1) requiring users to assign a rating to the content at issue; or (2) observing how the user uses the content after the content is played. ('123 patent, col. 1:35-38) Yet the patent notes that one problem with this is that asking a user to provide explicit ratings on the content that they play back "places an additional time-consuming burden . . . on the user." (*Id.*, col. 1:56-58) It also explains that "current recommenders (that learn from examples)" in the market did not "efficiently analyze playlists composed by a user" in that they did "not analyze how the playlists are made" and they made recommendations for playlists in "a too simple manner[.]" (*Id.*, col. 1:59-65) In this way, the patent—like Dr. Pazzani—appears to be saying that one of the benefits of the claimed method (in terms of how it would improve over the prior art technology) was that it would generate a user profile without bothering the user to further participate in the process, and that it would do so in a more efficient/complex way than what prior art systems were doing (i.e., by utilizing existing features of the playlists, like the occurrence frequency or the content relationship of the playlists). (D.I. 15 at ¶ 25 (Dr. Pazzani further explaining that the patented invention eliminates the "so called 'cold start' problem, because it generates a user profile and recommendations on the basis of the user's previously created playlists and properties derived from them, rather than from the users explicitly

---

to patented inventions when explaining whether those inventions are, or are not, valid/eligible/infringed. (Tr. at 92)

Additionally, it is worth noting that in Dr. Jeffay's deposition, he appeared to be unfamiliar with the way that Dr. Pazzani was using the "cold start" phraseology, and Dr. Jeffay testified that he did not recall hearing the term "cold start problem" with respect to recommendation systems prior to his involvement in this case. (D.I. 21, ex. B at 129-30) To the extent there is a fact dispute between the experts about what the "cold start problem" is and/or how it relates to recommendation methods/systems like those claimed in the patent, that would seem to bolster the argument that the Motion should be denied at step two.

indicating likes and dislikes of individual songs" and also "saves time and effort" in a manner that was "unconventional"))

In his declaration, Dr. Pazzani goes on to state:

> Furthermore, recommender systems at [the relevant time frame, June 2003] typically considered the properties of individual items, but not ordered collections of objects such as playlists. Recommender systems of this date did not derive properties such as tempo difference from items with ordered lists nor did they typically use signal properties automatically derived from digital audio. In the early 2000s, these features and components were unconventional when taken alone and were even more unconventional in combination.

(D.I. 15 at ¶ 23) This seems diametrically opposed to Dr. Jeffay's testimony. Dr. Jeffay explained that in the relevant time frame, it would have been decidedly conventional for a person of skill in the art to search a user's digital playlists and generate a user profile based on a feature of the playlists. (*See* D.I. 17 at ¶ 58) Yet Dr. Pazzani is saying that in the relevant time frame, it would have been entirely *un*conventional to do just that.

In sum, on the question of whether the ordered combination of elements in the claims amount to an inventive concept, there appear to be material disputes of fact. In coming to this conclusion, the Court recognizes that the claims do not appear to provide a detailed explanation of *how* the methods/mediums/devices analyze playlists to come up with the features at issue, or *how* they generate the user profiles at issue. (Tr. at 84; D.I. 11 at 20; *see also* '123 patent, col. 2:11-15) And at least to this lay person, the ordered combination of steps in the claims does not, at first blush, seem to be particularly complex. Those issues certainly may be relevant to patent eligibility. But with the experts having disagreements on key factual issues relevant to step two, a factfinder should really weigh in on this eligibility issue. *See Vaporstream, Inc. v. Snap Inc.*, No. 2:17-cv-00220-MLH (KSx), 2018 WL 1116530, at *6 (C.D. Cal. Feb. 27, 2018) (denying

the defendant's motion for summary judgment on Section 101 grounds because the parties' experts offered conflicting testimony with regard to "what was well-understood, routine, and conventional at the time of the invention"). For this reason, the Motion should be denied.

## IV. CONCLUSION

For the foregoing reasons, the Court finds that Defendants' Section 101 Motion with regard to the '123 patent should be DENIED.