**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| S.I.SV.EL. SOCIETA ITALIANA PER LO SVILUPPO DELL'ELETTRONICA, S.P.A., <br><br> Plaintiff, <br><br> v. <br><br> RHAPSODY INTERNATIONAL INC., <br><br> Defendant. | Civil Action No. 18-69-CJB |

**MEMORANDUM ORDER**

In this patent infringement action filed by Societa Italiana per lo Sviluppo dell'Elettronica S.p.A. ("Plaintiff") against Defendant Rhapsody International Inc. ("Defendant"), presently before the Court is a matter of claim construction. The Court resolves the claim construction disputes in the manner set out below.

**I.     BACKGROUND**

   **A.     The Parties and the Proceedings**

Plaintiff is a technology corporation organized under the laws of Italy, and it owns various United States patents. (D.I. 1 at ¶ 2) It now asserts two such patents in this case; at issue in this claim construction opinion is one of them: United States Patent No. 8,490,123 (the "'123 patent"). (*Id.* at ¶ 54) Defendant is a corporation organized under the laws of Delaware with a principal place of business in Seattle, Washington. (D.I. 35 at ¶ 3)

Plaintiff filed this action in January 2018. (D.I. 1) This case was referred to the Court by United States District Judge Maryellen Noreika in September 2018 for all purposes, up to and including summary judgment and *Daubert* motions. (Docket Item, Sept. 24, 2018)

Subsequently, in September 2019, the parties consented to the Court's jurisdiction to conduct all proceedings in the case. (D.I. 45)

The parties filed a joint claim construction brief on June 24, 2020; the brief listed seven terms/term sets ("terms") as being in dispute. (D.I. 77) Subsequently, the parties narrowed the number of disputed terms to four (all relating to the '123 patent), (D.I. 78; D.I. 79), and then further reduced the number of disputed terms to three, (D.I. 81). The Court conducted a *Markman* hearing by videoconference on July 22, 2020. (D.I. 83 (hereinafter, "Tr."))

### B.     The Patent in-Suit

The Court has previously described the '123 patent (entitled "Method and Device for Generating a User Profile on the Basis of Playlists") in its March 2019 Memorandum Opinion, wherein it denied Defendant's motion for summary judgment premised on patent ineligibility. (D.I. 26 at 2-4) The Court incorporates by reference the facts set out in that March 2019 decision. To the extent that other facts regarding the patent are relevant to the terms addressed below, the Court will discuss such facts herein.

## II.    STANDARD OF REVIEW

It is well-understood that "[a] claim in a patent provides the metes and bounds of the right which the patent confers on the patentee to exclude others from making, using, or selling the protected invention." *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1257 (Fed. Cir. 1989). Claim construction is a generally a question of law, although subsidiary fact finding is sometimes necessary. *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 837-38 (2015).

The Court should typically assign claim terms their "'ordinary and customary meaning[,]'" which is "the meaning that the term[s] would have to a person of ordinary skill in

the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (citations omitted). However, when determining the ordinary meaning of claim terms, the Court should not extract and isolate those terms from the context of the patent; rather it should endeavor to reflect their "meaning to the ordinary artisan after reading the entire patent." *Id.* at 1321; *see also Eon Corp. IP Holdings LLC v. Silver Spring Networks, Inc.*, 815 F.3d 1314, 1320 (Fed. Cir. 2016).

In proceeding with claim construction, the Court should look first and foremost to the language of the claims themselves, because "[i]t is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips*, 415 F.3d at 1312 (internal quotation marks and citations omitted). For example, the context in which a term is used in a claim may be "highly instructive." *Id.* at 1314. In addition, "[o]ther claims of the patent in question, both asserted and unasserted, can . . . be valuable" in discerning the meaning of a particular claim term. *Id.* This is "[b]ecause claim terms are normally used consistently throughout the patent, [and so] the usage of a term in one claim can often illuminate the meaning of the same term in other claims." *Id.* Moreover, "[d]ifferences among claims can also be a useful guide[,]" as when "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Id.* at 1314-15.

In addition to the words of the claims, the Court should look to other intrinsic evidence. For example, the Court should analyze the patent specification, which "may reveal a special definition given to a claim term . . . that differs from the meaning [that term] would otherwise possess" or may reveal an intentional disclaimer of claim scope. *Id.* at 1316. Even if the

specification does not contain such revelations, it "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Id.* at 1315 (internal quotation marks and citation omitted). That said, however, the specification "is not a substitute for, nor can it be used to rewrite, the chosen claim language." *SuperGuide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004). And a court should also consider the patent's prosecution history, if it is in evidence, because it "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution[.]" *Phillips*, 415 F.3d at 1317.

Extrinsic evidence, "including expert and inventor testimony, dictionaries, and learned treatises[,]" can also "shed useful light on the relevant art[.]" *Id.* (internal quotation marks and citations omitted). Overall, while extrinsic evidence may be useful, it is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Id.* (internal quotation marks and citations omitted); *accord Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 981 (Fed. Cir. 1995).

In utilizing these resources during claim construction, courts should keep in mind that "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998).

### III.  DISCUSSION

As noted above, the parties ultimately presented three disputed terms for construction. They are addressed in turn below.

### A. "stored on a/the media device"

The first term, "stored on a/the media device," appears in claims 1 and 11. Claim 1 recites:

> **1**. A method of generating a user profile for a given user from at least one first playlist including a first sequence of content and being associated with the given user and *stored on a media device*, said method comprising:
>
> automatically searching for the at least one first playlist among a plurality of playlists, wherein the plurality of playlists includes at least one of a second playlist and a third playlist, wherein the second playlist has a second sequence of content and is associated with a different user and the third playlist has a third sequence of content and is associated with the given user, and each playlist of the plurality of playlists including at least one identifying characteristic of content *stored on the media device*;
>
> analyzing the at least one first playlist and automatically deriving from the at least one analyzed first playlist at least one playlist feature expressing at least one property of the at least one first playlist, the at least one playlist feature comprising an occurrence frequency or at least a content relationship of the plurality of playlists; and
>
> automatically generating a user profile for the given user based on the analyzed at least one first playlist and the derived at least one playlist feature;
>
> wherein at least one of the said searching, analyzing, and generating comprises use of computerized hardware including a processing element.

('123 patent, col. 8:31-55 (emphasis added))  Claim 11 is a claim to a "media device for generating a user profile" as opposed to a method for generating such a user profile; that said, as relating to the term at issue, it recites very similar language to that in claim 1.  (*Id.*, col. 9:39-10:17)[1]

---

[1] The term at issue is used twice in claim 11 in a similar manner to how it is used in claim 1, with the exception that in the preamble of claim 11, the term is "stored on *the* media device" instead of "stored on *a* media device[.]"  ('123 patent, col. 9:39-42 (emphasis added))

5

The parties' proposed constructions are as follows:

| Term | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| "stored on a/the media device" | No construction necessary. | "located on a computer-readable medium in the user's media device" |

(D.I. 77 at 35)  In the briefing, the parties raised three potential disputes as to this term, which relate to:  (1) Defendant's view that the content must be *located* on a media device; (2) Defendant's view that the content must be stored on a *computer-readable medium* on the device; and (3) Defendant's view that the device must be *the user's device*.  (*Id.* at 36-39; *see also* Tr. at 16-17)

As to the first two issues, it is not clear to the Court that the parties actually have a live dispute.  With regard to Defendant's position that the word "located" should be used in any construction of this term, during the *Markman* hearing, Defendant's counsel agreed that Defendant simply views "located" as a synonym for "stored."  (Tr. at 53)  While Defendant's counsel suggested that there could possibly be future disputes over the scope of the word "stored," (*id.*), no such disputes have been clearly raised at this stage.  And as for Defendant's proposed addition of "computer-readable medium," the Court understands that it is premised on Defendant's view that a media device could not practice the method of claim 1 or read on the various limitations of claim 11 unless it included a computer-readable medium.  (Tr. at 51-53) Yet after listening to the back-and-forth at the *Markman* hearing, the Court is not convinced that there is now an actual dispute on this score—that is, that there is a real disagreement over whether a computer-readable medium is necessarily a part of the requisite media device.  (*See id.* at 31-32, 52)  The Court does not typically construe a term in a certain way unless prompted to do so by a clear, relevant dispute over the term's meaning.  *See O2 Micro Int'l Ltd. v. Beyond*

6

*Innovation Tech. Co.*, 521 F.3d 1351, 1360-63 (Fed. Cir. 2008).  For this reason, the Court declines (for now) to add this verbiage to any construction of the term.

The third issue, however, relates to a clear dispute between the parties: i.e., whether (as Defendant argues) when the claims require that certain content be "stored on the/a media device" this is a reference only to the *user's* media device.  For the three primary reasons set out below, the Court concludes that the claims include no such requirement.

First, the claim language provides some support to Plaintiff's contrary position.  In claim 1, when the claim makes reference to certain playlists that contain content, the claim refers to those playlists as being "associated with the given user" or being "associated with a different user[.]"  ('123 patent, col. 8:33, 8:39-41)  In other words, there the claim's text *explicitly links* the playlist with the user (or with "a different user").  In contrast, when the claim refers to "a" media device or "the" media device, it does not explicitly link that device to the user in a similar way (i.e., it does not refer to the device as "the user's media device").  (*Id*., col. 8:34, 8:43)  The point is that when the patentee wanted to denote that certain aspects of the claims must be associated with a particular user, or must be closely linked to a particular user, the patentee knew how to do so (and did in fact do so).  (D.I. 77 at 35; Tr. at 55-58)  But the patentee chose not to do this when describing the "media device."  This is thus one piece of evidence suggesting that the claims do not require the media device at issue to be the user's device.  (Tr. at 21-22, 57-58)

Second, the Court does not see the logic in one of Defendant's primary arguments.  In support of its proposal, Defendant rightly noted that the claims and the specification state that certain playlists utilized by the claimed inventions belong to "the given user" or to a "given single user" or "to the particular user[.]"  (Defendant's *Markman* Hearing Presentation at Slide 10 (citing '123 patent, col. 3:47-53, 3:57-63); *see also* '123 patent, col. 8:33, 8:39-41)  From

7

there, Defendant argued as follows: (1) we know that the purpose of the claims is to generate a user profile that is of interest to and helpful to "the given user"; (2) in accomplishing that, the claims in part utilize content drawn from playlists that are associated with *that user*; and so therefore (3) when it comes to the media device where content relating to the user profile is to be stored, it also stands to reason that this device would be *the user's* device. (D.I. 77 at 37-38; Tr. at 42-43, 54)

Yet in the Court's view, the logical leap inherent in that argument is not well supported. That is because although it is true that the claims and the specification do refer to how the invention makes use of certain playlists associated with the user, they *also* explain that the invention makes use of certain playlists that are *not* associated with that user—i.e., playlists that instead are associated with "a different user." For example, the specification states:

> Before the method is applied, it is assumed that playlists (i.e., a second set of playlists) are already obtained and residing *on the media device*. However, *these (said second set of playlists) may have been obtained by different users* . . . which is the reason for step **100** where playlists belonging to a given single user (i.e., a first set of playlists) [are] determined. . . . In step **100**, the media device will search for a first set of playlists among said second set of playlists. As a result, *said first set of playlists belongs only to the particular user*. Said *first set of playlists* can be isolated as files in and from one or more specified user directories, i.e. these files (playlists) are tagged, have a property (of the user) and/or have other identifying information *indicating said particular user only*.

('123 patent, col. 3:47-63 (emphasis added))  Similarly, claim 1 recites how the method at issue searches for "the at least one first playlist [associated with the given user] among a plurality of playlists" but where the plurality of playlists also includes a "second playlist" that "is associated with a different user[.]" (*Id.*, col. 8:31-40)  This is all to say that the patent is describing a media device that contains content associated not only with the given user, but also with people *other*

8

*than the given user*.  And if that is so, then it makes a little less sense to think that the media device that stores this content *must necessarily only belong to or be associated with the given user*.

Third, another of Defendant's key arguments is a clear example of seeking to limit claim terms to the contours of a preferred embodiment.  In this regard, Defendant relies on a portion of the specification that recites:  "The user profile then relieves him [i.e., the user] of the task of selecting appropriate content items from a huge amount of content available, e.g. on and from the Internet, previously stored on *his media device*, from a computer-readable medium, such as a CD, a DVD, etc."  (*Id.*, col. 6:39-43 (emphasis added) (*quoted in* D.I. 77 at 39))  The Court agrees with Defendant that this is an instance (really the only instance) in which the patent clearly refers to a media device that is the user's device.  (Tr. at 28)  But as Plaintiff points out, (*id*. at 27-28), this specification excerpt is simply describing an *example* of how the invention could work.  Nothing in the claims *requires* that the media device be the user's device (as opposed to the device of a third party that happens to contain content that is in some way associated with the user).  *See SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1286 (Fed. Cir. 2005) ("[W]ithout more[,] the court will not limit claim terms to a preferred embodiment described in the specification."); *Elm 3DS Innovations, LLC v. Samsung Elecs. Co.*, C.A. No. 14-1430-LPS-CJB, 14-1431-LPS-CJB, 14-1432-LPS-CJB, 2020 WL 1850657, at *10 (D. Del. Apr. 13, 2020) (adopting the plain and ordinary meaning of a term and rejecting the defendants' proposed construction that "improperly import[ed] a limitation from the

specification into the claims without evidence of the patentee's clear and unambiguous intent to limit claim scope").[2]

For all of these reasons, the Court rejects Defendant's proposal that the phrase "in the user's media device" be worked into a construction for this term. Having thus resolved the one clear dispute between the parties in Plaintiff's favor, the Court agrees with Plaintiff that no construction of the term is necessary. (Tr. at 59-60) Thus, "stored on a/the media device" should otherwise be afforded its plain and ordinary meaning.

> **B.** **"automatically derive/deriving" and "automatically generate/generating"**

The next two terms, "automatically derive/deriving" (collectively, the "automatically deriving" term) and "automatically generate/generating" (collectively, the "automatically generating" term) appear in claims 1 and 11. Because Defendant advocates similar constructions for both terms, and because the parties rely on similar evidence as to both terms, the Court will address them together. Again, claim 1 (which the parties treat as exemplary) recites in relevant part:

> **1**. A method of generating a user profile for a given user . . . comprising:
>
> . . .
>
> analyzing the at least one first playlist and *automatically deriving* from the at least one analyzed first playlist at least one playlist feature expressing at least one property of the at least one first playlist, the at least one playlist feature comprising an occurrence frequency or at least a content relationship of the plurality of playlists; and

---

[2] The Court also notes that claim 9 of the '123 patent includes an exemplary list of media devices. ('123 patent, col. 9:23-25) One such listed media device is a "jukebox[.]" (*Id.*) The Court does not naturally think of a "jukebox" as a device that necessarily (or even typically) is one that belongs to its user. (Tr. at 50-51) This is in turn a further point suggesting that Plaintiff's position is the correct one.

10

> *automatically generating* a user profile for the given user based on the analyzed at least one first playlist and the derived at least one playlist feature;
>
> wherein at least one of the said searching, analyzing, and generating comprises use of computerized hardware including a processing element.

('123 patent, col. 8:31-55 (emphasis added))[3] The parties' proposed constructions are as follows:

| Term | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| "automatically deriving" | No construction necessary. | "obtaining by means of computer code" |
| "automatically generating" | No construction necessary. | "creating by means of computer code" |

(D.I. 77 at 40, 45)

The key dispute here is as to Defendant's position that "automatically deriving" (a part of claim 1's "analyzing" step) and "automatically generating" (a part of claim 1's "automatically generating" step) both must be accomplished via the use of computer code.[4] At first blush, this suggestion does not seem far-fetched or unreasonable. After all, the patent specification does not appear to disclose any examples of these functions being performed *without* the use of computer code. (D.I. 77 at 43, 47) Plaintiff's counsel even conceded as much. (Tr. at 72, 80-81) And at this stage, the Court is not actually sure it understands how a media device would accomplish

---

[3] Claim 11 is a claim to a media device for generating a user profile for a given user, and it has a limitation for "an analyzing element" and "a generating element" that are worded similarly to claim 1's "analyzing" and "automatically generating" steps. ('123 patent, col. 10:8-17) Claim 11 does not contain a "wherein" clause like claim 1, and the relevant terms in claim 11 are "automatically derive" and "automatically generate[.]" (*Id.*) Neither party has suggested that any differences in the language of claim 1 and claim 11 are meaningful from a claim construction perspective.

[4] At oral argument, Defendant's counsel agreed that the Court need not address its proposal to substitute "obtaining" and "creating" for "deriving" and "generating," respectively, as those proposed changes do not get to the heart of the parties' claim construction dispute. (Tr. at 77-78) Thus, below the Court will not further discuss those aspects of Defendant's proposed constructions.

"automatically deriving" and "automatically generating" without the use of computer code.  (Tr. at 67-70)

But with all of that said, the Court still sides with Plaintiff.  It does so for two reasons.

Most significantly, the Court's conclusion is driven by the plain text of claim 1, which appears to require this outcome.  *See Pragmatus AV, LLC v. Yahoo! Inc.*, Civil Action No. 11-902-LPS-CJB, 2014 WL 1961980, at *13 n.9 (D. Del. May 15, 2014) (declining to construe the claim to read on an embodiment that did not require simultaneous display, because "the claims as written require[d] simultaneous display"); *see also Ecolab, Inc. v. FMC Corp.*, 569 F.3d 1335, 1344 (Fed. Cir. 2009) ("It is likewise well-settled that courts generally may not re-draft claims; we must construe the claims as written.").  Claim 1's final "wherein" clause recites, "wherein *at least one of* the said searching, analyzing, and generating comprises use of computerized hardware including a processing element."  ('123 patent, col. 8:53-55 (emphasis added))  This "at least one of" phraseology clearly indicates that while all three of the listed steps ("searching, analyzing, and generating") *could* be accomplished via the use of a computer processor/hardware, the claim is only *requiring* that one of the steps be accomplished in that manner (and thus, that only one of the steps must be accomplished via the use of computer code).  And so it necessarily follows that the claim explicitly allows for one or two of the steps to be accomplished without the use of computer code.  Indeed, were Defendant's construction to be adopted, the effect would be to excise the claim term "at least one of" and replace it with the term "all three of"—i.e., to render this portion of the claim a nullity.  (D.I. 77 at 44; Tr. at 76 (Defendant's counsel conceding that adopting its proposed construction would be, in effect "drawing a red line through the words 'at least one of' and replacing it with the words 'all three of'"))  This is disfavored.  *See Fontem Ventures, B.V. v. NJOY, Inc.*, CV 14-1645-GW(MRWx),

2015 WL 12766460, at *5 (C.D. Cal. Jan. 29, 2015) (rejecting a proposed claim construction that would have the effect of striking out certain claim language); *see also Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006) "[C]laims are interpreted with an eye toward giving effect to all terms in the claim.").

Moreover, the text of claim 17 also bolsters Plaintiff's position. That claim, which in turn depends on claim 11, recites "[t]he media device of claim **11**, wherein the searching element, the analyzing element, *and* the generating element are embodied in computerized hardware including a processing element." ('123 patent, col. 10:36-39 (emphasis added)) Thus, claim 17 clearly requires that all three described elements be accomplished via the use of computer hardware and a computer processor. And the principle of claim differentiation would therefore suggest that independent claim 11 does *not* require all three steps to be computerized in this way (and thus that its "automatically derive" or "automatically generate" requirements, which are associated with the "analyzing element" and "generating element" in the claim, *could* be accomplished without use of computer code). (D.I. 77 at 42, 46); *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998).[5]

Having clearly resolved this dispute in Plaintiff's favor, the Court does not see a need to offer a construction for these terms. Accordingly, the Court finds that no construction is

---

[5] The Court understands that Defendant may argue that in light of the resolution of this claim construction dispute, the claims are not enabled. (D.I. 77 at 43-44 (citing *Automotive Techs. Int'l, Inc. v. BMW of N. Am., Inc.*, 510 F.3d 1274, 1285 (Fed. Cir. 2007)); Tr. at 79) But enablement is an issue more properly taken up later in the case. *See Hill-Rom Servs., Inc. v. Stryker Corp.,* 755 F.3d 1367, 1374 (Fed. Cir. 2014) (cautioning "not to allow claim construction to morph into a mini-trial on validity"); *Waters Corp. v. Agilent Techs. Inc.*, C.A. No. 18-1450 (MN), 2019 WL 6255181, at *4 (D. Del. Nov. 22, 2019); *TQ Beta LLC v. Dish Network Corp.*, C.A. No. 14-CV-848-LPS-CJB, 2016 WL 356024, at *5 n.5 (D. Del. Jan. 28, 2016).

necessary and that "automatically derive/deriving" and "automatically generate/generating" should otherwise be afforded their plain and ordinary meaning.

## IV. CONCLUSION

For the foregoing reasons, the Court orders as follows:

1. "stored on a/the media device" should be afforded its plain and ordinary meaning

2. "automatically derive/deriving" should be afforded its plain and ordinary meaning

3. "automatically generate/generating" should be afforded its plain and ordinary meaning

Dated: August 10, 2020

*Christopher J. Burke*
Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE